Filed 9/14/20  P. v. Hernandez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E068906 |
| v. | (Super.Ct.No. RIF1600135) |
| DAVID LUIS HERNANDEZ et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Mac R. Fisher, Judge.

Affirmed in part; reversed in part with directions.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and

Appellant, David Luis Hernandez.

Victoria H. Stafford, under appointment by the Court of Appeal, for Defendant

and Appellant, Fernando Heredia.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Susan

Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.   INTRODUCTION

Codefendants and appellants Fernando Heredia (Heredia) and David Luis Hernandez (Hernandez) were convicted by a jury of robbery against N.H. and A.A.  (Pen. Code,[1] §§ 211, 213, subd. (a)(1), counts 1 & 2.)[2]  Additionally, the jury returned a true finding on gang enhancement allegations against Heredia (§ 186.22, subd. (b)(1)(C)) and also found Heredia guilty of a separate residential burglary arising out of a different incident (§ 459, count 5).  In bifurcated proceedings, Hernandez admitted an allegation that he was a principal in the robbery alleged in count 2, during which, at least one principal was armed with a firearm (§ 12022, subd. (a)(1)); while Heredia admitted to a prior conviction for an offense qualifying as a serious felony and strike prior (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)) and to suffering four prior prison terms (§ 667.5, subd. (b)).

Hernandez was sentenced to the midterm of four years on count 2 (§§ 211, 213, subd. (a)(1)); a concurrent term of three years on count 1 (§§ 211, 213, subd. (a)(1)); and an additional year for the firearm enhancement (§ 12022, subd. (a)(1)), representing a total of five years in state prison.

Heredia was sentenced to the upper term of six years doubled to 12 years on count 2 (§§ 211, 213, subd. (a)(1)); an additional 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)); an additional five years for the serious felony prior (§ 667,

---

[1]  All further statutory references are to the Penal Code.

[2]  Heredia was also found guilty of a residential burglary arising out of a separate set of events not relevant to the issues raised in this appeal.

2

subd. (a)); and an additional one year for the prison prior (§ 667.5, subd. (b)), for a total of 28 years in state prison.  Heredia was also sentenced to concurrent terms of 10 years on count 1 and 12 years on count 5.

Hernandez appeals his conviction arguing only that the trial court abused its discretion in denying his request to sever the trial, empanel a separate jury, or bifurcate the trial on Heredia's gang enhancement allegations.  Heredia appeals, arguing (1) there was insufficient evidence to support his conviction on the gang enhancement allegations; (2) his trial counsel's failure to object to opinions offered by a gang expert constituted ineffective assistance of counsel; (3) his state and federal constitutional rights to equal protection and a jury drawn from a fair cross-section of the community were violated by the prosecutor's improper exercise of peremptory challenges in violation of *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); (4) the matter should be remanded to allow the trial court to exercise its discretion to strike his enhancement under section 667, subdivision (a); and (5) his one-year enhancement imposed pursuant to section 667.5, subdivision (b), should be stricken in light of recent amendments to that statute.  We affirm the convictions of both defendants, but we remand the matter for resentencing as to Heredia so that the trial court may address the enhancements under sections 667, subdivision (a), and 667.5, subdivision (b).

## II.  FACTS & PROCEDURAL HISTORY

### A.  *Facts*

On January 5, 2016, N.H. and A.A. visited K.T.'s home in order to inspect a room that was available for rent.  K.T. was not present at the time, but he gave N.H. permission to enter the home to look at the available room.  While inside K.T.'s home, N.H. heard a knock on the front door, answered it, and encountered Hernandez and Heredia at the door.  After a brief verbal exchange, one of them kicked the door open, both entered the home, and one of them threatened N.H. and A.A. with a gun.  They took N.H.'s cell phone and the keys to his truck.  After Hernandez and Heredia left, N.H. discovered an amplifier, subwoofer, and his girlfriend's purse, as well as a backpack and a camera belonging to A.A., had all been taken from his truck.

### B.  *Charges*

In a third amended information, Hernandez and Heredia were charged with two counts of robbery (§§ 211, 213, subd. (a)(1), counts 1 & 2) and one count of residential burglary (§ 459, count 3) arising out of the January 5, 2016 incident involving N.H. and A.A.  Additionally, the information alleged Heredia personally used a firearm in the commission of these offenses in violation of sections 12022.53, subdivision (b), and 1192.7, subdivision (c)(8); committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang in violation of section 186.22, subdivision (b)(1)(C); and committed the offenses while released from custody prior to the judgment being final on an underlying offense in violation of section 12022.1.  As to Hernandez,

4

the information alleged he was armed with a firearm in violation of section 12022, subdivision (a)(1), in the commission of these offenses.

Finally, the information alleged that Hernandez had suffered one prior prison term (§ 667.5, subd. (b)), and that Heredia had suffered four prior prison terms (§ 667.5, subd. (b)); had been convicted of one serious felony prior (§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)); and had been convicted of a prior strike offense (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)).[3]

C. *Relevant Evidence at Trial*

  1. *Evidence related to the January 5, 2016 incident*[4]

    a.  Testimony of K.T.

K.T. testified that he lived in a home in the unincorporated area of Riverside County known as El Cerrito. In January 2016, he met N.H. and gave N.H. permission to come to his home for the purpose of renting one of the vacant rooms. At the time, K.T. had one other roommate, R.B. K.T. had arranged to meet N.H. at the house; however,

---

[3] Unrelated to the issues raised in this appeal, the information also charged both Hernandez and Heredia with personal use of a firearm while entering an inhabited dwelling in the commission of a burglary (§§ 1192.7, subd. (c)(8), 122022, subd. (a)(1), 667.5, subd. (c)(21)); charged Heredia with being a felon in possession of a firearm (§ 29800, subd. (a)(1), count 4); and charged Heredia with a separate residential burglary, which occurred on January 13, 2016 (§ 459, count 5).

[4] Witnesses were also called to testify regarding a January 13, 2016 incident resulting in separate charges of residential burglary against Heredia. However, Heredia does not challenge that conviction on appeal, and none of the issues raised on appeal require consideration of this evidence.

because K.T. was busy on the day of their planned meeting, he instead gave N.H. permission to enter the home in K.T.'s absence.

At the time of his testimony, K.T. was familiar with both defendants. K.T. stated that he had been told there would be "repercussions" if he testified in court against defendants; that he was specifically threatened by a person known as "Porks"; and that Porks told him he would not live if he testified against "Fern Dog." He also stated that R.B. commented to him that he would be crazy to appear in court and testify because K.T. would be a "dead man walking" if he did.

b. Testimony of N.H.

N.H. stated that A.A. had accompanied him to a home for the purpose of looking for a room to rent when two men forced their way into the home, threatened to shoot them, and forced them to undress. N.H. could not recall whether the men robbed him of any possessions during this incident; could not remember where the home was located; did not remember whether the home was owned by K.T.; did not recall ever attempting to rent a room from K.T.; and claimed to not know any person by the name of K.T.

N.H. had never met the two men prior to this incident, but he identified defendants as the two men involved. N.H. claimed he could not specifically identify the objects defendants were holding at the time, but he did recall that Heredia threatened to shoot him. He recalled that one of the defendants referred to himself as "Fern Dog" while leaving the home. N.H. stated he did not remember or did not understand the meaning of other statements made by defendants. He denied or could not recall anything being taken

6

from his person but stated that he later discovered items missing from his car, which included an amplifier and subwoofer from his stereo system.

N.H. remembered being stopped by a sheriff's deputy while driving in January 2016 and believed it was "possible" that he told the deputy that he had been robbed. He recalled subsequently bringing A.A. with him to the police station to report an "incident." He did not specifically recall the things he reported to the deputy, and a review of the transcript of his interview with the deputy did not assist him in recalling any details.

On cross-examination, N.H. admitted to being a drug addict; admitted he was probably using drugs at the time he was pulled over by the deputy; admitted he did not initially report an incident involving defendants; and admitted he did not tell anyone about any incident until he was pulled over by the deputy. He also admitted to having prior convictions for theft and drug related offenses. N.H. stated that Hernandez never threatened him.

c.  A.A.'s testimony

A.A. was also called to testify. At the time he testified, A.A. was in custody for committing a residential burglary. He denied knowing N.H.; denied knowing either defendant; denied being robbed regarding an incident in January 2016; and claimed that a recorded interview with law enforcement regarding that incident "never happened."

d.  Testimony of sheriff's deputy

A deputy with the Riverside County Sheriff's Department testified that on January 7, 2016, he encountered N.H. after initiating a traffic stop. At the time, the deputy was working on the sheriff's department's gang task force and initiated the traffic

7

stop because he had been given information that N.H. may have been involved in an incident at a nearby home owned by K.T. The deputy brought N.H. to the sheriff's station for an interview and, following that interview, N.H. brought A.A. to the station about an hour later. The deputy also interviewed A.A.

The following day, the deputy returned to the street where K.T.'s home was located. He noticed a car drive past K.T.'s home and slow in front of the house. Hernandez was discovered in the passenger seat of the vehicle, was arrested, and was taken to the Corona Police Department where he participated in a recorded interview after being informed of his rights.

e. A.A.'s recorded interview

In his recorded interview, A.A. stated that he and N.H. went to K.T.'s home because N.H. intended to rent a room from K.T. They arrived at the home, knocked on the door, received no answer, but found the door unlocked. N.H. called K.T. and was told he could go into the home, as well as which room was available to rent. N.H and A.A. began carrying some of N.H.'s possessions into the room. While the two were unpacking N.H.'s items, they heard a ring at the doorbell and went to answer the door. There was a "heavy-set" man at the door holding a flashlight who asked for K.T. After a brief exchange in which N.H. stated K.T. was not home, the man and another individual forced their way into the home and told N.H. and A.A. to "sit the fuck down." N.H. and A.A. initially tried to explain to the two men that they were there to rent a room from K.T. While they were trying to explain themselves, A.A. recalled three other individuals

8

walked out of rooms in the home, claiming that they did not hear N.H. or A.A. knocking earlier.

The taller of the two men stated he did not believe N.H. and A.A.; instructed them to take their clothes off; pulled out what appeared to be a black gun; and told both N.H. and A.A. that he would shoot them if they attempted to go anywhere. The taller man asked N.H., "Where are you from?," to which N.H. responded that he did not bang and did not run with any gang. In response, the taller man stated, "All right, well you know where you are . . . CVL, Corona Vatos Locos." A.A. recalled one of the other individuals in the home refer to the taller man as "Fern" or "Ferny."

The taller man then asked N.H. where the keys to his truck were located. After obtaining N.H.'s keys, the taller man left the house for a period of time while the "heavy-set" man stayed in the room watching them. When the taller man returned, he declared he was taking A.A.'s phone, and the two men eventually left. Once the two men left, N.H. and A.A. went to check N.H.'s truck and discovered that the amp and subwoofer had been taken, along with A.A.'s backpack and camera. A.A. identified Heredia as one of the two men in a photographic lineup during his interview.

f. N.H.'s recorded interview

In his recorded interview, N.H. stated that he was confronted by two individuals. The larger of the two held a gun and ordered N.H. to empty his pockets, take his clothes off, and sit down. N.H. described the gun as a black, semi-automatic nine-millimeter Glock. N.H. stated that he told the large man that he was at the house to rent a room

9

from K.T.; that K.T. gave him permission to be there; and that the man should call K.T. to verify those facts.

According to N.H., the larger man called K.T. and confirmed that N.H. was at the home to rent a room. Only after confirming with K.T. that N.H. was at the home to rent a room, did the man proceed to rummage through N.H. and A.A.'s belongings and take things. The man threatened to shoot them if they attempted to run during this time. N.H. stated that after the man had finished taking belongings from N.H. and A.A., the man identified himself as: "Fucking Fern Dog homey from fucking CVL, Corona homie." N.H. described the man's mannerism in making the statement as: "Like he's bangin' on me."

According to N.H., after the two men left, K.T. returned to the home. At some point, the taller man identified as Fern Dog also returned to the home. During this second encounter, Fern Dog refused to return any of their belongings; taunted A.A.; and appeared to threaten A.A. with violence, stating: "[W]hat—what— you wanna do something about it? You wanna fucking—you wanna catch a fade?"

g. Hernandez's prior statements[5]

During his interview with the deputy, Hernandez admitted that he had recently visited K.T.'s home after receiving a call from R.B.; that he encountered a "white kid and

---

[5] The parties agreed that Hernandez's prior statements were generally admissible under an exception to the hearsay rule. However, to minimize any prejudice arising out of a joint trial, the trial court utilized a procedure where the prosecutor was permitted to ask the deputy leading questions in order to avoid any of Hernandez's prior statements identifying or mentioning Heredia.

black kid" inside the home when he arrived; that he was holding a flashlight in his hand; and that he jammed his foot into the door of the home to force his way in when the "white kid" tried to close the door. Hernandez further acknowledged that, at some point, the "white kid" and "black kid" sat down, put their possessions on a table in the living room, and removed their clothing; but they did not explain why. He admitted that, at some point, he received verification from K.T. that the "black kid" and "white kid" had permission to be in the home. Finally, he admitted that the "white kid" handed over the keys to his truck and that, at some point, Hernandez took possessions from the "white kid's" truck.

### h. R.B.'s testimony

R.B. testified she was living in K.T.'s home at the time of the January 2016 incident. She heard noises from the living room, became scared, and called Hernandez to come over because he was a friend. She claimed not to have heard anyone knocking on the door to the home prior to hearing noises in the living room.

## 2. *Gang evidence*

### a. Testimony of gang expert

A Riverside County Sheriff's deputy was called to testify as a gang expert. The expert testified that Corona Varrio Locos (CVL) is an organized gang in the City of Corona, which claims most of Corona as its territory. He explained the importance of gaining respect and instilling fear in the community in gang culture generally. He also explained how the CVL gang generally engaged in a pattern of activity that included robberies, assaults, and possession of drugs and firearms. He acknowledged that not all

11

persons who spent time with gang members were considered members of the gang and occasionally, gang members would commit crimes with nonmembers associated with the gang.

The expert testified that he was familiar with Heredia and knew Heredia went by the gang moniker Fern Dog. The expert was also familiar with K.T.'s home as a place where CVL gang members were known to associate. The expert had previously served a warrant at K.T.'s home in December 2015 and recognized Heredia and Hernandez as among those present at the time. The expert identified several of Heredia's tattoos; described their symbolic importance within the CVL gang; and the predicate acts that were typically required before gang members could obtain certain tattoos. The expert further testified that Heredia had previously pled guilty to charges of committing an assault with a deadly weapon with a gang allegation enhancement.

Finally, the expert testified that he reviewed hundreds of jail telephone calls made by Heredia to his girlfriend. Several of the calls were played to the jury and included comments by Heredia bragging about assaulting someone and leaving the victim in his underwear; stating he had assaulted a CVL gang member who had fallen out of good standing; and opining that when released from custody, he expected to be respected because he had put in a lot of work for the gang. In one of the calls, Heredia asked his girlfriend to put pressure on R.B., and to tell "Porks" to put pressure on her.

Based upon his contacts with Heredia, Heredia's tattoos, and communications Heredia made while in custody, the expert opined that Heredia was a member of the CVL gang in January 2016. The expert also opined that there was no doubt in his mind that

12

Heredia was acting for the benefit of the CVL gang during the encounter with N.H. and A.A., based on the fact that the encounter occurred within CVL gang territory, as well as the level of intimidation and violence involved in the incident.

b. Testimony of Corona police officer

A Corona Police Department officer testified he was assigned to the regional gang task force and was familiar with CVL as the predominant gang in the City of Corona. He was familiar with Heredia, both from personal contact with him on the streets and investigations conducted by other officers. He knew Heredia went by the gang moniker Fern Dog and knew Heredia had several gang-related tattoos. The officer also explained that it was common for victims of crimes committed by gang members to refrain from disclosing the crimes to law enforcement or refrain from testifying at trials out of fear. He explained that it is common for gang members to call out their gang monikers and associations while committing crimes in order to scare their victims and potential witnesses.

c. Testimony of district attorney investigator

An investigator with the Riverside County District Attorney's Office was also called to testify. The investigator had previously worked as a police officer assigned to the gang task force in Corona. While working as an officer on the gang task force, the investigator became familiar with Heredia through personal contact and came to know Heredia's gang moniker as "Ferny" or "Fern Dog." The investigator recalled multiple prior instances of personal contact with Heredia in which Heredia admitted he was an

13

associate or member of the CVL gang. The investigator also knew Heredia had several tattoos associated with the CVL gang.

D. *Verdict and Sentencing*

On June 1, 2017, the jury found defendants guilty of the robbery charges arising out of the January 5, 2016 incident. (§§ 211, 213, subd. (a)(1), counts 1 & 2.) The jury also found Heredia guilty of the gang enhancement allegations (§ 186.22, subd. (b)(1)(C)) but was also unable to reach a verdict on the gun enhancement allegations against both defendants. The jury returned verdicts of not guilty on the burglary charges against both defendants arising out of the January 5, 2016 incident (§ 459, count 3) and the firearm possession charge against Heredia (§ 29800, subd. (a)(1), count 4). Finally, the jury found Heredia guilty of a separate residential burglary, which occurred on January 13, 2016. (§ 459, count 5.)

In bifurcated proceedings, Hernandez admitted the firearm enhancement on count 2 as part of a plea bargain; the trial court dismissed the prison prior allegations (§ 667.5, subd. (b)) against Hernandez following a petition to have the prior conviction reduced to a misdemeanor (§ 1170.18); Heredia admitted he had been previously convicted of an offense qualifying as a serious felony and strike prior (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)). Heredia also admitted he had been previously convicted of the four prior offenses alleged as the basis for prior prison term enhancements (§ 667.5, subd. (b)), but the trial court struck three of the four enhancements after determining they did not qualify for enhancements under section 667.5, subdivision (b).

Hernandez was sentenced to the midterm of four years on count 2 (§§ 211, 213, subd. (a)(1)); a concurrent midterm of three years on count 1 (§§ 211, 213, subd. (a)(1)); and an additional year for the firearm enhancement (§ 12022, subd.(a)(1)), representing a total of five years in state prison.

Heredia was sentenced to the upper term of 6 years doubled to 12 years on count 2 (§§ 211, 213, subd. (a)(1)); an additional 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)); an additional five years for the serious felony prior (§ 667, subd. (a)); and an additional one year for the prison prior (§ 667.5, subd. (b)), for a total of 28 years in state prison.  Heredia was also sentenced to concurrent terms of 10 years on count 1 and 12 years on count 5.

## III.   DISCUSSION

### A.   *Denial of Hernandez's Motion to Sever Trial Was Not an Abuse of Discretion*

The sole issue raised by Hernandez on appeal is that the trial court abused its discretion in denying his motion to sever trial, empanel a separate jury, or bifurcate trial of the gang enhancement allegations pertaining to Heredia.  Specifically, Hernandez argues that the gang evidence presented against Heredia was so unduly prejudicial that it deprived Hernandez of a fair trial.  We find no abuse of discretion on this record.

#### 1.   *Relevant procedural history*

Prior to trial, Hernandez requested a severance of trial or alternatively a separate jury.  Hernandez argued that the admission of gang evidence against Heredia would prejudice him and preclude him from getting a fair trial.  The trial court denied the request for a separate trial, noting that the gang charges were not made against

15

Hernandez; that none of the anticipated evidence or witnesses would be testifying to Hernandez's participation in a gang; and that attempting to hold separate trials or empanel separate juries would impose significant costs and logistical hurdles on the court. In the alternative, the trial court offered to give limiting instruction proposed by Hernandez regarding the use of gang evidence pertaining only to Heredia. Following this denial, Hernandez's counsel alternatively requested trial bifurcation on the gang enhancement allegations against Heredia. The trial court requested that the parties provide case law on the subject of bifurcation and identify the potentially prejudicial evidence the court would need to consider in order to evaluate the issue.

Thereafter, only the People filed a brief outlining the anticipated gang issues and evidence. The People's brief indicated its desire to call a gang expert and generally outlined the nature of the anticipated testimony to include opinions regarding (1) whether CVL is a criminal street gang; (2) whether Heredia's actions benefitted a gang; and (3) whether Heredia was an active participant in a street gang. The People also indicated an intent to introduce audio of recorded phone calls Heredia made while in custody; a copy of a letter written by Heredia while in custody; evidence of some of Heredia's prior convictions for gang-related offenses; and photographs of Heredia's tattoos.

Following briefing, the trial court indicated that it had reviewed the matter and could not determine any practical way to bifurcate the trial on the single issue of Heredia's gang enhancement allegations. After entertaining argument from counsel, the trial court denied the request, again stating that, as to Heredia, the court could not

16

conceive of a way to separate trial of the gang enhancement allegations from trial on the underlying robbery.

2. *General legal principles and standard of review*

"The Legislature has expressed a preference for joint trials. [Citation.] [Penal Code] [s]ection 1098 states that multiple defendants jointly charged with a felony offense 'must be tried jointly, unless the court order[s] separate trials.' This rule applies to defendants charged with 'common crimes involving common events and victims.' " (*People v. Carasi* (2008) 44 Cal.4th 1263, 1296.) The law thus "establishes a legislative preference for joint trials, subject to a trial court's broad discretion to order severance." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1079.) As explained by our Supreme Court, " ' "[t]he court should separate the trial of codefendants 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " ' [Citation.] We review a trial court's denial of severance for abuse of discretion [citations], based on 'the facts known to the court at the time of the ruling.' " (*Ibid.*) Further, even if "a reviewing court [were] to find a trial court abused its discretion in failing to grant a defendant's motion to sever, the defendant would not be entitled to relief on appeal unless [the defendant] could also demonstrate, to a reasonable probability, that [the defendant] 'would have received a more favorable result in a separate trial.' " (*Ibid.*)

Likewise, "[o]ur courts have consistently recognized the efficiencies that are achieved by way of a joint trial of related matters. [Citation.] Thus, in order to prevail

17

on a motion to bifurcate a gang enhancement, a defendant must 'clearly establish that there is substantial danger of prejudice requiring that the charges be separately tried.' " (*People v. Garcia* (2016) 244 Cal.App.4th 1349, 1357.) "We review the trial court's denial of [a] motion to bifurcate for abuse of discretion, based on the record as it stood at the time of the ruling." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 952.)

    3. *Analysis*

Here, it is undisputed that both Hernandez and Heredia were charged with common crimes, arising from common events, and involving common victims. Further, this case does not involve conflicting defenses, potential confusion over numerous counts and charges, or the possibility of exonerating evidence by a codefendant. On appeal, the only basis for Hernandez's claim that the trial court abused its discretion is that the gang evidence against Heredia created the potential for guilt by association. However, at the time of the trial court's ruling, the anticipated gang evidence identified for the trial court pertained *exclusively* to Heredia, without any suggestion that any such evidence would identify, name, or reference Hernandez. The trial court noted this point, concluding that the evidence did not seem especially prejudicial to Hernandez, and offered a limiting instruction to mitigate any potential prejudice. The court also noted that bifurcation could be confusing to the jury, since the jury would still be exposed to gang references in opening statements, during voir dire, and even in some of the underlying evidence regarding the robbery allegations. These were proper matters for the trial court to consider in balancing the risk of prejudice with the legislative preference for a joint trial

18

of all related matters, and we find no abuse of discretion in the trial court's decision to deny Hernandez's request.

Hernandez's reliance on actual testimony and evidence offered at trial to establish an undue risk of prejudicial association is unavailing. Review of a trial court's denial of a request for severance or bifurcation is based upon the facts and record known to the trial court *at the time of ruling*. (*People v. Thompson*, *supra*, 1 Cal.5th at p. 1079; *People v. Franklin*, *supra*, 248 Cal.App.4th at p. 952.) Thus, Hernandez cannot establish an abuse of discretion by exclusively pointing to testimony or evidence elicited at the time of trial but not identified for the trial court's consideration at the time it was asked to rule on the motion for severance or bifurcation. A trial court cannot abuse its discretion by failing to consider specific facts or testimony only subsequently disclosed.

Finally, we conclude that Hernandez has not shown prejudice warranting reversal. "A prejudicial association justifying severance will involve circumstances in which the evidence regarding one defendant might make it likely the jury would convict that defendant of the charges and, further, more likely find a codefendant guilty based upon the relationship between the two rather than upon the evidence separately implicating the codefendant." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 152.) This is typically established when "the quantity and quality of the evidence implicating one defendant compared to the other was so dissimilar that the jury likely convicted both defendants based upon the strength of the evidence against only one of them." (*Id.* at p. 151.) This is clearly not the situation presented in this case.

19

The jury found Hernandez guilty only on charges of robbery. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211; see *People v. Williams* (2013) 57 Cal.4th 776, 786.) There was ample independent evidence of Hernandez's guilt on these charges. The testimony of N.H. and recorded statement of A.A. both confirmed that two men forced their way into K.T.'s home and took their possessions. N.H. identified Hernandez as one of the two men in open court; and, in Hernandez's prior statement to the sheriff's deputy, Hernandez admitted to being present during this incident. Further, Hernandez admitted in his prior statement that he was the individual who used his foot to force his way into the home when N.H. attempted to close the door; that during this encounter, N.H. handed over the keys to N.H.'s truck; and that he personally took items from N.H.'s truck without permission.

Thus, this is clearly not a case involving evidence so dissimilar that it was likely the jury found Hernandez guilty only by association with Heredia. The record discloses sufficient evidence for the jury to conclude Hernandez took personal property through the use of force and fear, irrespective of any gang evidence presented against Heredia. Hernandez's assertion, that his admission of taking property from N.H.'s car would at best support a conviction for theft, is also unpersuasive. Our Supreme Court has previously held that taking the key to a vehicle from the victim's immediate presence, by use of force or fear, can constitute a robbery of a vehicle, despite the vehicle being parked a quarter of a mile away. (See *People v. Webster* (1991) 54 Cal.3d 411, 440-442.)

Accordingly, the evidence was more than sufficient for the jury to convict Hernandez of robbery, even absent any of the gang evidence related to Heredia; and Hernandez has not shown that he would have received a more favorable result, even if he had been granted a separate trial or bifurcation of Heredia's gang allegations.

B. *Sufficient Evidence Supports Heredia's Gang Enhancement Conviction*

On appeal, Heredia argues there was insufficient evidence to support his conviction on gang enhancement allegations pursuant to section 186.22, subdivision (b)(1)(C). Heredia does not dispute that sufficient evidence supports the conclusion that he was a member of a known street gang but, instead, argues that the evidence was insufficient to support the jury's conclusion that the specific underlying offense in this case—the robbery of N.H. and A.A.—was gang-related and committed with the specific intent to promote, further, or assist a gang in criminal activity. We disagree.

1. *General legal principles and standard of review*

"Section 186.22, subdivision (b)(1) enhances the sentence of 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by *gang members*.' " (*People v. Garcia, supra*, 244 Cal.App.4th at p. 1366.) "There are two prongs to the gang enhancement under section 186.22, subdivision (b)(1). [Citation.] The first prong requires that the prosecution prove the underlying felony was 'gang related.' [Citations.] . . . [¶] Section 186.22, subdivision (b)(1) provides three alternatives for establishing the first prong . . . . The offense may be committed (1) for the benefit of a gang; (2) at the direction of a gang; or (3) in association

21

with a gang." (*People v. Weddington* (2016) 246 Cal.App.4th 468, 484.) "The second prong 'requires that a defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' " (*Ibid*.) "[A]ll that is required is a specific intent 'to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.) "[A]s to the specific intent prong that '[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.' [Citation.] 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Rios* (2013) 222 Cal.App.4th 542, 567-568.)

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

## 2. *Application*

Here, we have no doubt that substantial evidence supports the first prong of the enhancement. The prosecution presented the testimony of a gang expert who explained that CVL is an organized gang in the City of Corona, claiming most of Corona and its surrounding area as its territory; that gaining respect and instilling fear in the community is important in gang culture; and that CVL would benefit from crimes involving violence and intimidation within its gang territory because such actions dissuade victims and witnesses from cooperating with law enforcement. As explained by our Supreme Court: "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a [] criminal street gang' within the meaning of section 186.22(b)(1)." (*People v. Albillar*, *supra*, 51 Cal.4th at p. 63.) Additionally, Heredia made it clear to N.H. and A.A. who was committing the violence against them, and to whom credit and respect should be given, by declaring that he was, "Fucking Fern Dog homey from fucking CVL, Corona, homie." Thus, sufficient evidence in the record supports the jury's finding that the first prong of section 186.22 was satisfied in this case.

With respect to the second prong, Heredia argues that insufficient evidence supports a finding of specific intent, since the evidence suggests that his robbing N.H. and A.A. was merely a crime of opportunity and not motivated by a desire to promote, further, or assist the CVL gang in its criminal activities. Specifically, Heredia argues that the only evidence connecting the robbery to the CVL gang was Heredia's own identification as a member of the gang and that this statement alone does not suggest a

23

gang-related purpose. However, we cannot ignore the evidence regarding the context in which Heredia's statement was made.

As the gang expert testified, K.T.'s home was located within CVL gang territory and was known to be a place where members of the CVL gang would associate; and, in fact, the expert had previously executed a warrant at K.T.'s home where he encountered members of the CVL gang. The recorded interview with A.A. set forth that Heredia proceeded to rob them of their possessions and threaten to shoot them only after they had disclosed they were at K.T.'s home for the purpose of renting a room. According to N.H., Heredia had already confirmed N.H.'s purpose with K.T. over the telephone prior to the robbery and both reported that Heredia announced his gang affiliation during or after the robbery. Both a gang expert as well as a gang task force officer testified that such announcements are commonly used by gang members to intimidate people in their communities and dissuade cooperation with law enforcement.

These facts are analogous to those presented in *People v. Mendez* (2010) 188 Cal.App.4th 47. In *Mendez,* the defendant asked the victim if he was "from anywhere," which the victim understood to be a request to identify any gang affiliation; the defendant announced his gang affiliation during the commission of the crime; and a gang expert testified that the announcement of gang affiliations to victims helped "enhance" and "promote" the gang by instilling fear in the victim. (*Id.* at pp. 51, 56-57.) Based upon these facts, the Court of Appeal concluded that sufficient evidence supported the jury's true findings on gang allegations. (*Id.* at p. 56.) As in *Mendez*, the facts of this case support a reasonable inference that Heredia held a specific intent to commit the robberies

24

for the purpose of instilling fear in N.H. and A.A. in order to promote or enhance the CVL gang's criminal activities.

While the jury was certainly entitled to infer that the robberies were merely a crime of opportunity, the evidence here equally supports a reasonable inference that Heredia knew persons living in K.T.'s home were uniquely positioned to witness activities involving CVL gang members and that Heredia, upon learning N.H. and A.A. might be new residents in that home, was motivated to deliberately intimidate them in an effort to make clear that cooperation with law enforcement would not be tolerated. Therefore, sufficient evidence in the record supports the jury's finding that the second prong of section 186.22 was satisfied in this case.

C. *Heredia Has Not Established His Counsel Was Ineffective in Failing to Object to Specified Gang Testimony*

On appeal, Heredia also argues that his conviction must be reversed because his trial counsel's failure to object to an inadmissible opinion offered by the prosecution's gang expert constituted ineffective assistance of counsel. We conclude that the record does not establish ineffective assistance.

" ' "In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof." ' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

25

Here, Heredia's argument is premised solely on trial counsel's failure to object to allegedly inadmissible expert testimony. However, even assuming such testimony was inadmissible, this fact alone does not meet Heredia's burden to establish that trial counsel's performance was "deficient" demonstrating ineffective assistance. As explained by our Supreme Court, " '[w]hether to object to inadmissible evidence is a tactical decision [and] because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.) "Such claims must be rejected on direct appeal if the record does not affirmatively show why counsel failed to object and the circumstances suggest counsel could have had a valid tactical reason for not objecting." (*People v. Jones* (2009) 178 Cal.App.4th 853, 860.) Where the record is silent, it is defendant's burden to show that his counsel's failure to act had "no conceivable tactical purpose" in order to prevail on appeal. (*People v. Centeno* (2014) 60 Cal.4th 659, 675.)

Thus, it is not enough for Heredia to simply point to an instance in which his trial counsel failed to object to allegedly inadmissible evidence on appeal. Even if the underlying evidence had been inadmissible, such failure to object, alone, does not amount to a showing of deficient performance in support of a claim of ineffective assistance. Heredia makes no attempt to argue that his trial counsel's failure to object could *not* be explained by a valid tactical reason, and his claim must be rejected.

Moreover, a review of the record strongly suggests that counsel's failure to object was in fact a deliberate, tactical decision. The opinion testimony that Heredia now complains of on appeal consists of testimony by the prosecution's gang expert that there

26

was no doubt in the expert's mind that Heredia was acting "for the benefit of" the CVL gang in commission of the underlying crimes.  The record indicates that Heredia's trial counsel deliberately referred to this very opinion in closing argument.  Trial counsel did so to argue that the logical extension of the gang expert's reasoning leads to absurd results.[6]  Thus, the record suggests that trial counsel made a tactical choice to allow the gang expert to express a seemingly overbroad opinion in order to use that statement to later attack the expert's credibility with the jury.  Such a decision clearly falls within the scope of reasonable trial tactics.

Because defendant has offered no argument to suggest that the failure to object here could have no valid tactical reason and because the record suggests at least one reasonable tactical purpose for Heredia's trial counsel to do so, Heredia has not met his burden on appeal to establish ineffective assistance of counsel.  We decline to reverse his conviction on this basis.

D.  *Heredia Has Not Shown a Discriminatory Use of Preemptory Challenges*

Heredia also claims the prosecutor improperly exercised peremptory challenges to excuse three prospective jurors, who were all African-American women, in violation of *Batson*, *supra*, 476 U.S. 79 and *Wheeler*, *supra*, 22 Cal.3d 258.  Specifically, Heredia

---

[6]  Specifically, counsel argued:  "Well, everything that was done was done at the behest of or in association with—at the direction of a criminal street gang, specifically CVL.  Really?  A gang member can't do anything that is not gang-related.  [The expert] said that's right.  My response was, Really?  How about if he goes to Ralph's, shopping?  How about if he picks his kids up at the daycare?  How about if he helps a friend?  Anything he does is gang-related?  You betcha.  Really?  Really?  He's an expert.  You can listen to what he says.  You don't have to believe everything he says, and I'll tell you why.  That one response doesn't make any sense.  It just flat doesn't make any sense."

claims the prosecutor's peremptory strikes of Prospective Jurors S., C., and V. violated his state and federal constitutional rights to equal protection and a jury drawn from a fair cross-section of the community. We find no error in the trial court's denial of his *Batson/Wheeler* challenge following the dismissal of Prospective Jurors S. and C. We further conclude that any challenge to the prosecutor's peremptory strike of Prospective Juror V. has been forfeited for failure to make an objection in the trial court.

　　1.　*Relevant procedural history*

　　　　a.　Background

Following the prosecutor's exercise of preemptory challenges against Prospective Jurors S. and C., defendants raised a *Batson/Wheeler* objection on the basis that both S. and C. were African-American women. At the time, the prosecutor had exercised a total of nine challenges. Additionally, there were at least four or five women on the prospective panel who had not been challenged—at least one of whom was also African-American—and at least five other African-American women in the prospective pool of jurors who had yet to be called up for voir dire. The trial court did not make a ruling regarding whether defendants had established a prima facie showing of discriminatory purpose, but instead requested that the prosecutor state her reasons for exercising her challenges to S. and C. on the record. The prosecutor explained that she challenged both S. and C. because of their prior work experience in the medical field.

After the prosecutor offered her explanation, the trial court proceeded to state: "All right. I have heard the justification. I've heard the plea to the Court from both counsel for the defendants. And I believe that the choice, as made by [the prosecutor],

28

was genuine and sincere and supported by the record as her choice, based on those reasons. The reasons are other than race and gender. [¶] Insofar as gender, there appear to be a number of women remaining. I mean, before I say –" At this point, defense counsel interrupted the trial court mid-sentence, but the trial court proceeded to complete its immediate thought by stating: ". . . By my count, four or five remain. So it's race; yes?" In response, defense counsel confirmed that his *Batson/Wheeler* objection was based upon race and immediately proceeded to raise the prospect of Juror No. 8 as another prospective juror in the medical field who was not challenged. The trial court responded that any comparison of Juror No. 8's treatment at this point would seem speculative and premature since defendants' *Batson/Wheeler* objection had been made before the prosecutor had a chance to use all of her challenges, and defense counsel conceded that point. Thereafter, the trial court concluded the hearing by stating: "All right. I think I've ruled. And I've denied the motion."

The following day of trial, Heredia made another *Batson/Wheeler* objection following the prosecutor's exercise of a peremptory challenge against Prospective Juror C.D. Heredia's counsel specifically stated the objection was based on the fact that C.D. was an African-American female. At this point, Hernandez's counsel added that since the last *Batson/Wheeler* objection, the prosecutor had also challenged Prospective Juror V., who was also an African-American female. Again, the trial court did not rule on whether defendants had made a prima facie case, but solicited the prosecutor's justifications for dismissal of C.D. The prosecutor explained that she exercised her challenge against C.D. because C.D. had previously worked, for more than a decade, as a

29

fraud investigator. Following this explanation, the trial court asked Heredia's counsel to clarify his objection, stating: "So your Wheeler presently is as to [C.D.]; yes?," to which, Heredia's counsel responded "Correct." The trial court proceeded to accept the prosecutor's explanation with respect to Prospective Juror C.D. and deny the *Batson/Wheeler* motion. The prosecutor was not asked to provide an explanation for exercising a challenge to V.; Heredia's counsel made no further mention of V.; and the trial court made no further mention of V.

  b. Voir dire of prospective jurors

Because Heredia requests we engage in a comparative juror analysis for the first time on appeal, we also summarize the voir dire proceedings concerning the jurors discussed in Heredia's appellate brief. The record does not indicate any of these individuals were questioned in more than a cursory manner by any parties.

Prospective Juror S. worked as a medical assistant and lived alone. She had three adult children; did not know anyone with any negative contact with law enforcement; did not know anyone who had ever been the victim of a crime; and stated that she would be a fair judge. Her occupation specifically involved working with addiction medicine and included alcohol, drugs, and prescription drug addictions. She noted that if she initially disagreed with other jurors, it would take a long time to convince her otherwise, but she would engage in deliberation and discussion.

Prospective Juror C. stated she was a homemaker who lived with her husband and two adult children. Her husband worked in information technology for a car company; her son was a part-time student who also worked for a shipping/delivery company; and

her daughter was a full-time student. She only had some college education; had previously served in the military as a pharmacy technician and field medic; and had also previously worked as a medical receptionist.

Prospective Juror V. worked as a clinical nurse manager in patient care. She had two daughters, one of whom worked as a nurse practitioner and the other was disabled. She previously served on two juries and reached verdicts in both cases. Her significant other was a correctional officer, and two of her nine siblings had previous criminal convictions involving check cashing and fraud.

Juror No. 8 stated he was a registered nurse who worked as a kidney transplant coordinator. His wife was a teacher, and he had two teenage daughters. He had a cousin who worked in law enforcement, but otherwise had no negative contact with police and stated that he could serve as a fair juror. The record does not disclose Juror No. 8's ethnicity.

2. *General legal principles and standard of review*

"Both the state and federal Constitutions prohibit the use of peremptory challenges to exclude prospective jurors based on race or gender." (*People v. Bonilla* (2007) 41 Cal.4th 313, 341.) The trial court's review of peremptory strikes is governed by a three-step inquiry. (*Johnson v. California* (2005) 545 U.S. 162, 168; *People v. Lenix* (2008) 44 Cal.4th 602, 612.) "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines

31

whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the opponent of the strike." (*People v. Lenix*, at pp. 612-613.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports is conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*People v. Lenix*, *supra*, 44 Cal.4th at pp. 613-614.)

3. *Any challenge to Juror V. was forfeited*

Initially, we conclude that any claim that the challenge to Prospective Juror V. was based on impermissible discrimination was forfeited for failure to preserve the issue. The failure to clearly articulate a *Batson/Wheeler* objection to a peremptory challenge against a specific juror forfeits the issue for appeal. (*People v. Cunningham* (2015) 61 Cal.4th 609, 662.)

Here, the record does not indicate that Heredia ever challenged the dismissal of V. in the proceedings below. When making his second *Batson/Wheeler* objection, Heredia's counsel specifically identified the dismissal of Prospective Juror C.D. as the basis for the objection. While Hernandez's counsel mentioned the dismissal of Prospective Juror V.

32

during argument, this does not in itself provide grounds for Heredia to raise this issue on appeal. "Generally, failure to join in the objection or motion of a codefendant constitutes a waiver of the issue on appeal." (*People v. Wilson* (2008) 44 Cal.4th 758, 793; see *People v. Jacobs* (1987) 195 Cal.App.3d 1636, 1656 ["On appeal, a defendant cannot take advantage of objections made by a codefendant in the absence of stipulation or understanding to that effect."].) Nothing in the record suggests that Heredia's counsel joined in the argument made by Hernandez's counsel or sought to expand his initial objection to include consideration of Prospective Juror V. In fact, after Hernandez's counsel mentioned Prospective Juror V., the trial court explicitly requested clarification as to the scope of Heredia's objection and in response, counsel confirmed that the objection was based upon the dismissal of C.D.

Further, even if we were to assume Heredia had intended to join in a motion premised upon the dismissal of V., the issue would still be forfeited for failure to obtain a ruling on that point. Our Supreme Court considered the sufficiency of an objection under similar circumstances in *People v. Lewis* (2008) 43 Cal.4th 415 (*Lewis*), disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912. In *Lewis*, defense counsel mentioned the prosecutor's excusal of a prospective juror during a hearing in which the trial court was faced with multiple *Batson/Wheeler* objections by different parties, but counsel failed to obtain a ruling regarding dismissal of that specific juror. (*People v. Lewis*, at pp. 481-482.) In concluding that such failure forfeited the issue on appeal, our high court explained: "[W]hether the trial court ignored counsel's comments . . . or simply forgot about them. Either way, it was incumbent on counsel, if they wished to

pursue the matter, to secure a ruling from the trial court [and] [t]he failure to do so forfeits the claim." (*Ibid.*)

Here, despite the mention of V. by Hernandez's counsel, the prosecutor was not asked to explain her preemptory challenge of V.; Heredia's counsel made no further mention of V.; and the trial court made no mention of V. in denying the motion. Heredia's counsel did not ask the trial court to clarify its ruling or make any attempt to secure a ruling based upon consideration of V.'s dismissal. Accordingly, even if Heredia had expressed some intent to join in an objection raised by Hernandez, the failure to obtain a ruling forfeits the issue on appeal. We thus proceed to consider Heredia's *Batson/Wheeler* claims only as to Prospective Jurors S. and C.[7]

4. *Substantial evidence supports the trial court's denial of Heredia's* Batson/Wheeler *motion*

Here, the trial court did not make any ruling on whether defendants made an initial prima facie case of discrimination regarding the dismissal of S. and C., but proceeded directly to the second and third stage of the *Batson/Wheeler* analysis by soliciting reasons from the prosecutor, stating that it found the prosecutor's reasons "genuine and sincere," and denying the defendants' motion. Where the trial court makes a ruling pursuant to the third stage of the *Batson/Wheeler* analysis, we proceed directly to review of that ultimate

---

[7] Despite asserting an objection below, Heredia is not challenging the dismissal of C.D. on appeal.

question.  (*People v. Hardy* (2018) 5 Cal.5th 56, 76.)[8]

" 'At the third stage of the *Wheeler/Batson* inquiry, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." ' " (*People v. Jones* (2011) 51 Cal.4th 346, 360.)  "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.)

However, " '[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global

---

[8] The California Supreme Court's jurisprudence regarding appellate review in such a situation is unclear.  We note that in *In People v. Taylor* (2010) 48 Cal.4th 574, our high court considered a situation in which the trial court made no ruling in the first step of the *Batson* analysis, proceeded to solicit the prosecutor's reasons for exercising a peremptory challenge, and denied the motion without comment.  (*Taylor*, at pp. 612-614.)  In *Taylor*, it rejected the notion that an appellate court should proceed directly to the review of the third step and concluded that such a situation does not imply the trial court found a prima facie case of discrimination existed.  (*Ibid*.)  However, several years later, our high court issued an opinion in *People v. Scott* (2015) 61 Cal.4th 363, which included a footnote stating:  "When a trial court solicits an explanation of the strike without first declaring its views on the first stage, we infer an 'implied prima facie finding' of discrimination and proceed directly to review of the ultimate question of purposeful discrimination." (*Id.* at p. 387, fn. 1.)  The footnote made no mention of and appears to have completely ignored *Taylor*.  Nevertheless, the footnote in *People v. Scott* has been subsequently cited as the governing jurisprudence by our high court.  (See *People v. Hardy*, *supra*, 5 Cal.5th at p. 76; *People v. Miles* (2020) 9 Cal.5th 513.)  Accordingly, we will presume the prior guidance set forth in *Taylor* has been impliedly overruled and follow the more recent authority on this point.

finding that the reasons appear sufficient.' " (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1171.) Conversely, "[w]here . . . the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible [citation], and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson/Wheeler* motion denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge." (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 929.)

Here, the prosecutor explained that she exercised peremptory challenges against S. and C. because each had an occupational background that involved work in the medical field, and the trial court found this reason to be sincere and genuine. This justification is supported by the record. During voir dire, S. represented that she worked as a medical assistant in addiction medicine, and C. represented that she had previously worked as a pharmacy technician and field medic. Additionally, this justification is not inherently improbable, as California authorities have recognized that a prosecutor is permitted to "challenge a potential juror whose occupation, in the prosecutor's subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected." (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 925; see *People v. Arellano*

36

(2016) 245 Cal.App.4th 1139, 1165 ["A prospective juror's occupation may be a permissible, nondiscriminatory reason for exercising a peremptory challenge."].) Accordingly, there is no reason for us to depart from the deference otherwise due to trial court's determination that the prosecutor's nondiscriminatory reasons for challenging S. and C. were credible.

     5. *Heredia's arguments on appeal do not compel a different conclusion*

On appeal, Heredia argues we should substitute our judgment for that of the trial court because the court did not "make a reasoned effort to evaluate the genuineness of the prosecutor's explanation" and "simply accepted it without question." We do not believe the record supports this characterization. The trial court's initial statement that, "I believe that the choice, as made by [the prosecutor], was genuine and sincere and supported by the record," may appear conclusory if considered in a vacuum. However, the trial court followed this statement with: "The reasons are other than race and gender. [¶] Insofar as gender, there appear to be a number of women remaining. I mean, before I say—," before being interrupted by Heredia's counsel. Thus, a fair reading of the trial court's statements in context disclose that the trial court was in the process of explaining its conclusion for finding the prosecutor's reasons credible,[9] but was cut short when Heredia's counsel interrupted and sought to raise an additional argument. Thus, contrary

---

     [9] The trial court's reference to the manner in which the prosecutor had exercised peremptory challenges up until that point was clearly relevant to a finding of credibility. The trial court is permitted to consider the " 'prosecutor's explanation in light of the circumstances of the case as then known [including] his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily.' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 907.)

to Heredia's characterization, the record does suggest that the trial court made a sincere and reasoned effort to assess the prosecutor's credibility and, as such, we should afford the trial court's credibility determination great deference.

Heredia also suggests that the prosecutor's reasons for striking S. and C. were merely pretextual because the justification "made no sense in the context of this case"; "nothing in [their] medical background would have caused them to be biased against the prosecution"; and they were "otherwise unobjectionable jurors." However, this type of argument "misses the point. . . . [T]he issue . . . is not whether a juror held views that would impair his or her ability to follow the law. Unimpaired jurors may still be the subject of valid peremptory strikes. The issue instead is whether the prosecutor held a genuine race-neutral reason for exercising a strike." (*People v. Armstrong* (2019) 6 Cal.5th 735, 773.) To establish this, a defendant "must do more than argue that the prosecutor's concerns might have been unfounded. The 'inquiry is focused on whether the proffered neutral reasons are subjectively *genuine*, not on how objectively reasonable they are.'" (*Id.* at p. 776.) Thus, the fact that an otherwise nondiscriminatory justification does not appear objectively reasonable does not warrant an appellate tribunal's substitution of its own credibility determinations for those of the trial court.

Finally, Heredia argues that a comparative analysis of the prosecutor's treatment of S., C., and Juror No. 8 suggests the prosecutor's justifications were merely pretextual. Comparative juror analysis allows the court to " 'compare the responses of the challenged jurors with those of similar unchallenged jurors who were not members of the challenged jurors' racial group.'" (*People v. Hardy*, *supra*, 5 Cal.5th at p. 77.) "[E]vidence of

38

comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 622; see *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1174.)  However, the trial court here never conducted a comparative analysis, and the record does not appear adequate to conduct such an analysis for the first time on appeal.  As both parties acknowledge, Juror No. 8's ethnicity is unclear from the record.  Further, there was almost no voir dire questioning of any of the individuals whom Heredia requests us to compare, leaving us with little more than basic information regarding each individual's immediate family and occupation.  It would be impossible for us to make any meaningful comparisons or conclusions on such a silent record.  We do note, with the limited information before us, that the prosecutor expressed her subjective belief that the type of work done by Juror No. 8 did not involve direct patient care, whereas the type of work done by S. and C. did involve such care.  It is not inherently improbable that a prosecutor would subjectively believe that persons engaged in the direct physical care of others may be more sympathetic jurors, and therefore less desirable jurors, to sit on any criminal case.

Moreover, even assuming a meaningful comparative juror analysis were possible and such an analysis raised an inference of intentional discrimination, it would not be sufficient to warrant reversal in the context of this case.  "[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 622.)  Standing alone, it is not necessarily sufficient to overturn a trial court's factual finding.

(*Id.* at p. 626.)  This is because "circumstantial evidence may support a logical conclusion that the disputed fact is true[, b]ut information may often be open to more than one reasonable deduction."  (*Id.* at p. 627.)  "With regard to an appellate court's review of circumstantial evidence . . . ' " ' [i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " '  [Citations.]  This same principle of appellate restraint applies in reviewing the circumstantial evidence supporting the trial court's factual findings in a *Wheeler/Batson* holding."  (*Ibid.*)

Here, even assuming for the sake of argument that a comparative juror analysis would raise an inference of intentional discrimination, other evidence in the record strongly suggests otherwise.  Heredia's *Batson/Wheeler* objection was based on the fact that both S. and C. were African-American women.  However, neither the defendants nor the victims appeared to share these specific characteristics.  (See *People v. Rhoades* (2019) 8 Cal.5th 393, 430 [Any inference of discrimination is diminished where the excused jurors do not share a common identity with defendants or victims.].)  Additionally, at the time Heredia objected, only two of the nine strikes exercised by the prosecutor had been directed toward African-American women, and at least five additional African-American women remained in the pool of prospective jurors.  (See *People v. Sanchez* (2016) 63 Cal.4th 411, 436 [Exercising two of eight peremptory challenges against two of five minority prospective jurors does not create inference of discriminatory purpose.].)  Finally, it was undisputed the prosecutor did not challenge at

40

least one African-American woman who was on the prospective panel. (See *People v. Reed* (2018) 4 Cal.5th 989, 1000 [Acceptance of one or more minority jurors "lessen the strength of any inference of discrimination that the pattern of the prosecutor's strikes might otherwise imply."].) Thus, even if an inference of discrimination could be drawn from a comparative analysis of S. and C. with Juror No. 8, it would not be sufficient to warrant reversal where other evidence in the record supports an equally reasonable, competing inference.

E. *We Remand the Matter to Address Sentencing Issues*

1. *The trial court should have an opportunity to exercise its discretion under sections 667 and 1385*

Heredia contends that his sentencing should be remanded to permit the trial court to exercise its discretion to strike a five-year enhancement pursuant to recent amendments made to sections 667 and 1385. The People agree that the amendments to sections 667, subdivision (a), and 1385, subdivision (b) (Stats. 2018, ch. 1013, §§ 1- 2) embodied in Senate Bill No. 1393 (2017-2018 Reg. Sess.), which permit a trial court to exercise discretion to dismiss or strike a five-year consecutive term imposed for prior serious felony convictions, retroactively apply to defendant's case pursuant to *People v. Garcia* (2018) 28 Cal.App.5th 961, 971. Nevertheless, the People argue that remand is not required here because the record indicates the trial court would not have exercised its discretion to dismiss the serious felony enhancement. We do not believe the record is sufficient to allow us to draw this conclusion.

It is true that "[w]e are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion." (*People v. Jones* (2019) 32 Cal.App.5th 267, 272.) However, to make this determination, "we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*Id.* at p. 273)

The People argue that the trial court's denial of Heredia's motion to dismiss his prior strike conviction for purposes of sentencing pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, and the trial court's imposition of the upper term on all counts indicates the trial court would not have exercised its discretion to dismiss Heredia's prior serious felony enhancement had it been given the opportunity to do so. However, while imposing the upper term on each count, the trial court exercised its discretion to run some of these sentences concurrently instead of consecutively. Further, the trial court expressly prefaced its sentencing decisions by noting its desire for some degree of leniency, stating: "I was given some limited options. I could impose a significantly longer sentence, but I've chosen not to do that." Thus, we cannot conclude on this record that the trial court clearly would have declined to dismiss the prior serious felony enhancement had it been given the opportunity to exercise such discretion. Accordingly, we remand the matter for resentencing under sections 667 and 1385 without expressing an opinion as to how the trial court should exercise its discretion on the question of whether to strike or dismiss Heredia's prior serious felony enhancement.

2. *Heredia's enhancement under section 667.5, subdivision (b) should be stricken upon resentencing*

In supplemental briefing, Heredia argues that his one-year sentence enhancement imposed as the result of a prior felony conviction involving a term in state prison should be stricken in light of recent amendments to section 667.5, subdivision (b) (Stats. 2019, ch. 590, § 1), embodied in Senate Bill No. 136 (2019-2020 Reg. Sess.). The amendment became effective January 1, 2020, and it precludes the imposition of one-year sentence enhancements for a prior prison term unless the prior offense was sexually violent in nature. (§ 667.5, subd. (b).) The People concede that the prior conviction underlying defendant's sentence enhancement here would not qualify for an enhancement under the amended statute. Because the amendment is ameliorative in nature and defendant's conviction was not yet final at the time the amendment took effect, we agree that defendant's one-year sentence enhancement pursuant to section 667.5, subdivision (b), should be stricken. Thus, upon remand for resentencing, the trial court is directed to strike Heredia's one-year sentence enhancement imposed pursuant to former section 667.5, subdivision (b). (Stats. 2014, ch. 442, § 10.)

## IV. DISPOSITION

Heredia's sentence is vacated and the matter remanded to allow the trial court to exercise its discretion in resentencing Heredia on all counts.[10] Upon remand, the trial

---

[10] *People v. Buycks* (2018) 5 Cal.5th 857, 893; see *People v. Edwards* (2011) 195 Cal.App.4th 1051, 1060 ["If correction of a sentencing error may affect the trial court's

court is directed to strike Heredia's one-year sentence enhancement imposed pursuant to section 667.5, subdivision (b), and further instructed to exercise its discretion to determine whether Heredia's prior strike and serious felony enhancement should be stricken or dismissed pursuant to sections 667 and 1385.

In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:


RAMIREZ _____
P. J.


McKINSTER _____
J.

---

*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
discretionary decisions in determining an appropriate sentence, the remedy is to reverse and remand for resentencing."].